UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS OF MICHIGAN, | |
| Plaintiff, | Case No. _____ |
| v. | Honorable _____ |
| JENNIFER A. ABRUZZO, in her official capacity as GENERAL COUNSEL NATIONAL LABOR RELATIONS BOARD, | |
| Defendant. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Associated Builders and Contractors of Michigan, by and through its undersigned attorneys, hereby files its Complaint for Declaratory and Injunctive Relief against Jennifer A. Abruzzo, in her official capacity as General Counsel of the National Labor Relations Board. ABC of Michigan (hereinafter "ABC Michigan") alleges:

### INTRODUCTION

1. Since being appointed General Counsel of the National Labor Relations Board in 2021, Jennifer Abruzzo has embarked on a personal campaign to transform federal labor law under the National Labor Relations Act ("Act") to favor unions, and to disfavor employers.

2. She has done so, not as a legislator enacting laws, but as a *prosecutor*.

1

3.  As chief labor prosecutor, Abruzzo has attempted to overhaul federal labor law, not by using her valid statutory authority to investigate and prosecute cases once unfair labor practice charges are filed, but rather by making public threats in *memos*. Even the media have taken notice of Abruzzo's penchant for writing public memos and have dubbed her "The Memo Writer."[1]

4.  As General Counsel, Abruzzo is not authorized to file a charge alleging an unfair labor practice against an employer or a union; she is *only* authorized to impartially investigate and prosecute once a charge is filed.

5.  In recent public remarks reported this month by Bloomberg Law, Abruzzo revealed that, when she became General Counsel, she initially targeted over 50 separate labor issues and precedents that she disfavored and sought to overturn.[2]

6.  As reported, Abruzzo continues to cajole unions to file unfair labor practice charges against employers because she "is still lacking cases she can use to challenge certain precedents as part of her campaign to shift federal labor law to benefit workers and unions."[3]

7.  The article referenced Abruzzo's use of memos and speeches to publicly identify those precedents she wanted to overturn, which would "likely motivate unions to file charges focused on creating the vehicles to change those precedents."[4]

---

[1] Harold Meyerson, *The Memo Writer*, The American Prospect (Apr. 2022), *available* at https://prospect.org/labor/memo-writer-jennifer-abruzzo.

[2] Robert Iofalla, *Abruzzo's Plan to Overhaul NLRB Precedent Still in Need of Cases*, Bloomberg Law (Mar. 1, 2023), *available* at https://news.bloomberglaw.com/daily-labor-report/abruzzos-plan-to-overhaul-nlrb-precedent-still-in-need-of-cases.

[3] *Id.*

[4] *Id.*

8. The conference moderator joked that she "saw union counsel making a Christmas wish list for Jennifer."[5]

9. One of the precedents Abruzzo initially targeted in a 2022 public memo is the National Labor Relations Board's *Babcock* decision, which has been good law for *seventy-five years. See Babcock v. Wilcox Co.*, 77 N.L.R.B. 577 (1948).

10. That case held that employers may express their opinion on unions at meetings that employees must attend. And both the Act and the First Amendment protect an employer's speech expressed to their employees on unionization, so long as the employer's speech contains no threat of reprisal or force or promise of benefit.

11. These longstanding labor precedents are founded on the free expression of ideas and recognize that it is beneficial for employees to hear the opinions on unions from *both* employers and unions.

12. Indeed, U.S. labor policy balances benefits and burdens neutrally among employers, employees, and unions alike, because that kind of policy avoids strife and unrest historically associated with labor disputes that negatively affect the public's interest. *See* 29 U.S.C. § 151.

13. But Abruzzo's actions disfavor neutral labor policy and are aimed at preventing employees from hearing their employer's opinion on unions. Despite employees' rights to support or *oppose* unions, she only wants employees to hear opinions on unions from *unions*.

---

[5] *Id.*

14. So she wrote a memo, Memorandum GC 22-04, and published it on the Board's public website.[6] In her public Memorandum, Abruzzo strongly criticized the 75-year-old *Babcock* decision and said it was a "license to coerce" employees and "an anomaly in labor law" "based on a fundamental misunderstanding of employers' speech rights."[7]

15. Abruzzo then proposed a censorship scheme in her public Memorandum designed to overturn the *Babcock* precedent that she disfavors and suppress employers' speech to their employees.

16. First, Abruzzo said, "I will urge the Board to correct that anomaly." Second, Abruzzo said, "I will propose the Board adopt sensible assurances that an employer must convey to employees in order to make clear that their attendance is truly voluntary."

17. By inserting *herself* into the discussion, Abruzzo's Memorandum is not merely her opinion or an attempt to convince others that *Babcock* is an anomaly.

18. Rather, it is Abruzzo's attempt to intimidate employers so they will not express their opinion on unions at meetings that employees must attend, or risk that Abruzzo will prosecute them before the National Labor Relations Board for an unfair labor practice.

19. Moreover, her Memorandum is Abruzzo's attempt to coerce employers to "adopt" her approved words and language—"sensible assurances"—when they

---

[6] *See* www.nlrb.gov/news-outreach/news-story/nlrb-general-counsel-jennifer-abruzzo-issues-memo-on-captive-audience-and.

[7] *See id.*

4

express their opinion on unions at meetings that employees must attend, or risk prosecution by her before the Board.

20. When an official inserts herself into the discussion, her attempt "to convince" crosses the line into an attempt "to coerce" and is deemed to be a threat.

21. Abruzzo crossed the line and threatened prosecution in her Memorandum.

22. Supreme Court precedent prohibits a *government official* from making a threat of prosecution that amounts to a censorship scheme abridging First Amendment liberties and infringing free speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 52, 64 (1963) (emphasis provided). The Sixth Circuit applied the *Bantam Books* precedent and held an association had standing to sue on behalf of its members whose speech were chilled "by way of threat of punishment and intimidation to quell speech." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 761, 764-65 (6th Cir. 2019).

23. As General Counsel, Abruzzo may *prosecute* unfair labor practices, but she may not use public threats of prosecution, outside of the formal NLRB enforcement process, in order to achieve her desired ends.

24. The memo-writing approach, if not enjoined, allows government officials like Abruzzo to coerce employers to forgo their free-speech rights due to the threat of being dragged through a prosecutorial process—in other words, to chill speech simply by leveraging the specter of coercive government power, rather than addressing specific, alleged misconduct and proving a case through the Act's administrative scheme.

25. Abruzzo's threat of prosecution in her Memorandum conflicts with the terms of her statutory authority, which requires her to enforce labor laws impartially, including those precedents she disfavors.

26. Abruzzo's *ultra vires* threat to prosecute employers in her public Memorandum chills ABC Michigan employer members' free speech rights and violates the First Amendment.

## PARTIES

27. Plaintiff Associated Builders and Contractors of Michigan is a statewide trade association representing the commercial and industrial construction industries. Its principal place of business is located at 123 W. Allegan Street, Lansing, Michigan 48933.

28. ABC Michigan is supported by three local chapters: Greater Michigan, Southeastern Michigan, and Western Michigan. ABC Michigan employer members are subject to the Act. Their speech rights are germane to ABC Michigan's purpose. Neither the claims asserted, nor the relief requested requires their participation.

29. Defendant Jennifer A. Abruzzo has been General Counsel since July 22, 2021, and she is being sued in her official capacity.

30. As General Counsel, Abruzzo is responsible for the impartial investigation and prosecution of unfair labor practice allegations under the Act once a charge is filed, and for the general supervision of the regional field offices in processing and prosecuting cases before the Board.

## JURISDICTION AND VENUE

31. This case raises federal claims arising under the First and Fifth Amendments of the United States Constitution; therefore, the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

32. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202; Rules 57 and 65 of the Federal Rules of Civil Procedure; and the general legal and equitable powers of this Court.

33. Venue is appropriate under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and ABC Michigan maintains is principal place of business within this judicial district.

## FACTUAL ALLEGATIONS

### *The Act, Board, and the General Counsel*

34. The Act governs labor law among private employers, unions, and employees. To promote the public's interest by eliminating strife and unrest historically associated with labor disputes, U.S. policy balances the burdens and benefits among these three groups. *See* 29 U.S.C. § 151.

35. The National Labor Relations Board is an independent federal agency charged with enforcing the Act, a statute enacted by Congress in 1935 and codified at 29 U.S.C. §§ 151-169.

36. The Act governs, among other things, the right of most private-sector employees to determine whether to have unions as their bargaining representatives.

37. The Act further provides remedies against unfair labor practices committed by private-sector employers and labor organizations.[8]

38. The Act makes clear that a private employer does not commit an unfair labor practice when they express to their employees "any views, argument, or opinion" the employer has on employee union representation, so long as the speech contains no threat of reprisal or force or promise of benefit. 29 U.S.C. § 158(c).

39. The Board consists of five members and primarily acts as a quasi-judicial body in deciding and adjudicating cases based on formal records in administrative proceedings. Board members are appointed by the President to five-year terms, with Senate consent.[9]

40. The Board sets agency policy primarily through the adjudication of cases.[10]

41. The Board also sets agency policy through proposed rulemaking subject to public notice and comment in accordance with the Administrative Procedure Act.

42. Congress delegated to the Board the authority to make, amend, and rescind rules and regulations necessary to carry out the provisions of the Act. *See* 29 U.S.C. § 156.

43. In contrast, Congress did *not* delegate to the General Counsel the authority to make, amend, and rescind rules and regulations necessary to carry out the provisions of the Act.

---

[8] *See* www.nlrb.gov/about-nlrb/what-we-do/introduction-to-the-nlrb.
[9] *Id.*
[10] *See* www.nlrb.gov/reports/agency-performance/board-decisions-issued.

44. Although the Office of General Counsel is under the Executive Branch like the Board, the General Counsel position is independent and separate from the Board.

45. Many years ago, the Board "controlled not only the filing of complaints, but their prosecution and adjudication" as well. *NLRB v. Food & Commercial Workers Union*, 484 U.S. 112, 117 (1987).

46. But after 1947, Congress separated the prosecuting function from the adjudication function, placing the former in the General Counsel, and making that individual "an independent official appointed by the President." *Lewis* v. *NLRB*, 357 U.S. 10, 16, n.10 (1958); *see also* 29 U.S.C. § 153(d) (providing for appointment of the General Counsel).

47. Congress thus separated the Board into "two independent branches," *Food & Commercial Workers*, 484 U.S. at 129, and made the General Counsel "independent of the Board's supervision and review." *Id*. at 118.

48. The General Counsel serves as a prosecutor whose responsibilities include impartially investigating and prosecuting unfair labor practices under the Act and before the Board, once a charge is filed by a union, employee, or employer.

49. Neither the General Counsel, Board, Regional Directors nor field office employees may initiate unfair labor practice charges under the Act.

50. The General Counsel further serves in a supervisory role over the Regional Directors and field offices in processing those cases where charges are brought under the Act and in those cases the office prosecutes before the Board.

51. A charge deemed meritorious can result in the issuance of a complaint that could lead to an administrative hearing before the Board (unless there is a settlement).

52. A complaint includes any unfair labor practice that occurred within the past six months of filing a charge. *See* 29 U.S.C. § 160(b).

53. After issuing a complaint, the General Counsel becomes a representative for the charging party throughout settlement discussions and the adjudicative process before the Board.

54. Although the Board cannot assess penalties, the General Counsel and Regional Directors may seek make-whole remedies, such as reinstatement and backpay for discharged workers, and informational remedies, such as requiring an employer to post notice promising to not violate the law.

### *Abruzzo's Memorandum GC 22-04*
### *and Credible Threat to Prosecute Employers*

55. On April 7, 2022, Abruzzo issued Memorandum GC 22-04, in which she announced that she would seek to overturn longstanding precedent to prohibit employers from discussing unionization with employees during mandatory meetings. She signed the Memorandum in her official capacity as General Counsel.

56. The Memorandum, entitled "The Right to Refrain from Captive Audience and other Mandatory Meetings," a true and correct copy of which is attached as Exhibit 1, was directed to all "Regional Directors, Officers-in-Charge, and Resident Officers."

57. Abruzzo's Memorandum was publicly published and posted on the Board's website, and it remains posted to the Board's public website at the time of filing this lawsuit.

58. Abruzzo's public Memorandum is not an expression of her opinion to convince others that *Babcock* is an anomaly.

59. Abruzzo's public Memorandum is not an authorized government communication that is protected speech by the First Amendment.

60. Publicly publishing her Memorandum on the Board's website was not essential to Abruzzo's impartial investigative or prosecutorial decisions on (1) whether a charge against an employer under the Act was meritorious; (2) whether to issue a complaint against an employer after a charge was filed under the Act; (3) whether to settle with an employer charged under the Act; or (4) whether to prosecute, settle, or dismiss a charge or complaint against an employer under the Act.

61. The Board maintains on its public website an official flowchart containing the essential steps in the Board's formal unfair labor practice process.[11]

62. The Board's official flowchart reveals that the formal unfair labor practice process does not require the General Counsel to post memos on the Board's public website.

63. Nor does the Board's official flowchart and formal process make posting memos essential to the General Counsel's investigative or prosecutorial decisions.

---

[11] *See* www.nlrb.gov/resources/nlrb-process.

64. Abruzzo's Memorandum GC 22-04 is not listed on the Board's official flowchart that contains the critical and essential steps in the formal unfair labor practice process.

65. The Board's official flowchart depicting its formal unfair labor practice process is as follows:

**CHARGE**
Filed with Regional Director; alleges unfair labor practice by employer or labor organization.

**INJUNCTION**
Regional Director **must** ask district court for temporary restraining order in unlawful boycott and certain picketing cases.

**INVESTIGATION**
Regional Director determines whether formal action should be taken.

**WITHDRAWAL – REFUSAL TO ISSUE COMPLAINT – SETTLEMENT**
Charge may, with Agency approval, be withdrawn before or after complaint is issued. Regional Director may refuse to issue a complaint; refusal (dismissal of charge) may be appealed to General Counsel. Settlement of case may occur before or after issuance of complaint (informal settlement agreement subject to approval of Regional Director; formal settlement agreement executed simultaneously with or after issuance of complaint, subject to approval of Board). A formal settlement agreement will provide for entry of the Board's order and may provide for a judgement from the court of appeals enforcing the Board's order.

**COMPLAINT AND ANSWER**
Regional Director issues complaint and notice of hearing. Respondent files answer in 14 days.

**INJUNCTION**
General Counsel **may**, with Board approval, ask district court for temporary restraining order after complaint is issued in certain serious unfair labor practice cases.

**HEARING AND DECISION**
Administrative Law Judge presides over a trial and files a decision recommending either (1) order to cease and desist from unfair labor practice and affirmative relief or (2) dismissal of complaint. If no timely exceptions are filed to the Administrative Law Judge's decision, the findings of the Administrative Law Judge automatically become the decision and order of the Board.

**DISMISSAL**
Board finds respondent did not commit unfair labor practice and dismisses complaint.

**REMEDIAL ORDER**
Board finds respondent committed unfair labor practice and orders respondent to cease and desist and to remedy such unfair labor practice.

**OTHER DISPOSITION**
Board remands case to Administrative Law Judge for further action.

**COURT ENFORCEMENT AND REVIEW**
Court of appeals can enforce, set aside or remand all or part of the case. U.S. Supreme Court reviews appeals from courts of appeals.

13

66. Abruzzo has never publicly disavowed her statements and views that she expressed in her public Memorandum.

67. Abruzzo has never retracted her Memorandum from the Board's public website.

68. Abruzzo's public Memorandum was not issued by the Board as proposed rulemaking pursuant to the Administrative Procedure Act; it was not subject to public notice and comment; and it was not published in the Federal Register.

69. In her public Memorandum, Abruzzo provided a brief history of the basic principles of labor law but then rejected one of those longstanding principles, stating: "[T]he Board years ago incorrectly concluded that an employer does not violate the Act by compelling its employees to attend meetings in which it makes speeches urging them to reject union representation."

70. Abruzzo characterized the 75-year-old Board decision she was criticizing, *Babcock v. Wilcox Co.*, 77 N.L.R.B. 577 (1948), as a "license to coerce" employees and "an anomaly in labor law, inconsistent with the Act's protection of employees' free choice and based on a fundamental misunderstanding of employers' speech rights."

71. Abruzzo then explained how she would seek to use her position to overturn *Babcock*: by targeting employers with unfair labor practice prosecutions when an employer speaks to an employee about unionization and the employee is either required (1) to "convene" on paid time or (2) "cornered" by management while performing their job duties.

72. To further her goal to use her position to overturn the *Babcock* precedent, Abruzzo focused on two lines of attack. First, Abruzzo said, "I will urge the Board to correct that anomaly." Second, Abruzzo said, "I will propose the Board adopt sensible assurances that an employer must convey to employees in order to make clear that their attendance is truly voluntary."

*March 2023: Abruzzo Diligently Looks for New Cases
to Overturn Disfavored Precedents*

73. In March 2023, Bloomberg Law published an article on Abruzzo's efforts to use her position to change the law to disfavor employers, "Abruzzo's Plan to Overhaul NLRB Precedent Still in Need of Cases," a true and correct copy of which is attached as Exhibit 2.

74. The article noted that, in public comments at a recent legal conference, Abruzzo said she initially targeted over 50 separate legal issues and Board precedents she disfavored when she became General Counsel.

75. As reported, several of those precedents are good law that Abruzzo "wants the [B]oard to overturn, yet [she doesn't] have a case where that's a possibility."

76. The article reported that Abruzzo's use of memos and speeches to publicize those legal precedents she wanted to overturn would "likely motivate unions to file charges focused on creating the vehicles to change those precedents."

77. In the article, Abruzzo said, "It's more important to me that we are remedying workplace violations as quickly as possible."

78. Some regional offices have started to prosecute employers charged with unfair labor practices related to general allegations that an employer required its employees

15

to attend mandatory work meetings for the purpose of exposing them to the employer's views in opposition to the union.

79. For example, Region 29 in Brooklyn, New York, has investigated charges and is prosecuting a complaint against Amazon for unfair labor practices based on its speech to employees about unionization. *See e.g. In re Amazon.com Services, Inc. et al.*, Case No. 29-CA-280153, National Labor Relations Board, Region 29.[12]

80. The Board has 26 regional offices across the country. Region 7 encompasses areas within Michigan and has offices in Grand Rapids and Detroit.

81. A recent Freedom of Information Act ("FOIA") request and *Law360* analysis and report revealed vast differences in the rates at which the 26 regional offices found merit to charges of unfair labor practice violations under the Act. A true and correct copy of this report and analysis is attached as Exhibit 3.

82. For example, some regional offices found merit to charges at *double* the rates of others, and there was wide variance in how each regional office prosecutes unfair labor practices, according to the *Law360* analysis.

*Abruzzo's Credible Threat of Prosecution in her Memorandum*
*Chills ABC Michigan Employer Members' Protected Speech*

83. Jimmy E. Green is the President and CEO of Associated Builders and Contractors of Michigan.[13]

---

[12] The *Amazon* case pending before the NLRB has been consolidated with several other cases involving Amazon in which the Amazon Labor Union is also a party. The *Amazon* NLRB case has been further cited in papers filed in another case against Abruzzo involving the Memorandum, which is pending in the United States District Court for the Eastern District of Texas, Case No. 4:22-cv-00605-ALM.
[13] *See* www.abcmi.com/Who-is-ABC/About-ABC-of-MI/ABC-Staff.

84. As President, Green is responsible for the Public Policy and Government Affairs in Michigan for ABC Michigan and its employer members.

85. ABC Michigan is a statewide trade association representing the commercial and industrial construction industries.

86. Membership in ABC Michigan is available to all private businesses and employers in the construction industry that believe in the Merit Shop philosophy, which means members believe neutrally balanced labor law legislation that embraces fair play for *both* employer and employee is essential to the preservation of our nation's free enterprise system.

87. ABC Michigan and its employer members are subject to the National Labor Relations Act.

88. ABC Michigan employer members are dedicated to open competition, equal opportunity, and accountability in the construction industry.

89. ABC Michigan employer members develop people, win work, and deliver that work safely, ethically, profitably, and for the betterment of the communities in which ABC Michigan and its employer members work.

90. ABC Michigan and its employer members are on notice that Abruzzo posted her Memorandum GC 22-04 to the Board's public website, where it remains posted at the time of filing this lawsuit.

91. ABC Michigan and its employer members are further on notice of Abruzzo's plan to overturn the *Babcock* precedent that she described in her public Memorandum.

92. For example, ABC Michigan and its employer members are on notice that to advance her goal to use her position as General Counsel to overturn the *Babcock* precedent, Abruzzo focused on two lines of attack. First, Abruzzo said, "I will urge the Board to correct that anomaly." Second, Abruzzo said, "I will propose the Board adopt sensible assurances that an employer must convey to employees in order to make clear that their attendance is truly voluntary."

93. ABC Michigan and its employer members are on notice of Abruzzo's recent public remarks as reported by Bloomberg Law on March 1, 2023.

94. For example, ABC Michigan and its employer members are on notice that as reported, Abruzzo "is still lacking cases she can use to challenge certain precedents as part of her campaign to shift federal labor law to benefit workers and unions."

95. Moreover, ABC Michigan and its employer members are on notice that as reported by Bloomberg Law, Abruzzo's use of memos and speeches to publicly identify those precedents she wanted to overturn would "likely motivate unions to file charges focused on creating the vehicles to change those precedents."

96. ABC Michigan employer members' interpretation of Abruzzo's public Memorandum is that it's intended: (1) as a threat to intimidate employers and that Abruzzo will prosecute employers before the Board for an unfair labor practice if they express their views, argument, or opinion on unionization during mandatory work meetings; (2) as a threat to intimidate employers by placing a target on their backs and declaring open season for unions to file unfair labor practice charges against employers to create a vehicle for Abruzzo to overturn *Babcock*; and (3) as a threat to

18

intimidate employers by coercing them to "adopt" Abruzzo's approved words and language—"sensible assurances"—when employers express their opinion on unions at meetings that employees must attend, or risk prosecution by her before the Board.

97. But for Abruzzo's threat of prosecution in her public Memorandum by inserting herself into the discussion, ABC Michigan employer members would engage in lawful free speech and express to their employees their views, argument, or opinion on unionization during mandatory work meetings.

98. These ABC Michigan employer members do not, however, wish to make threats of reprisal or force or promises of benefit during speeches to their employees on unionization at mandatory work meetings.

CLAIMS FOR RELIEF

COUNT I – Free Speech<br>
Abruzzo's Memorandum GC 22-04 is a purely *ultra vires* act that violates the First Amendment because it compels employers under threat of prosecution to express certain speech to their employees.

99. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

100. Under the *Larson* framework and holding in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), a federal official may be sued in their official capacity for injunctive relief when the official violates the Constitution.

101. As General Counsel, Abruzzo may *prosecute* unfair labor practices within the formal Board enforcement process. But Abruzzo may not *threaten prosecution* by inserting herself into the discussion in public memos outside of the formal Board process.

19

102.     Abruzzo's public Memorandum is a threat to prosecute employers for their speech. Abruzzo inserted herself into the discussion in her Memorandum outside of the formal Board enforcement process and crossed the line into illegal coercive behavior, which violates the First Amendment.

103.     Abruzzo's public Memorandum may not reasonably be interpreted as her opinion or attempt to convince others that *Babcock* is an anomaly because she inserted herself into the discussion.

104.     Abruzzo's threat to prosecute employers subject to the Act in her public Memorandum is a purely *ultra vires* act that conflicts with both the First Amendment and the terms of her statutory authority under the Act.

105.     She is a recalcitrant federal official. Sovereign immunity does not protect her non-discretionary and purely *ultra vires* threat in her public Memorandum to prosecute employers for their lawful speech. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1041 (6th Cir. 2022) (citing *Larson*, 337 U.S. at 689); *Bantam Books,* 372 U.S. at 64; *Speech First,* 939 F.3d at 761, 764-65.

106.     Moreover, courts have recognized that individuals may seek injunctive relief against an official who has threatened to prosecute them for protected speech. "The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his *urging* be imposed unless there is compliance with his demands." *Backpage.com, LLC v. Dart,*

807 F.3d 229, 231 (7th Cir. 2015) (Posner, J.) (emphasis added) (citing, inter alia, *Bantam Books*, 372 U.S. at 64-72).

*107.*     That is what Abruzzo has done here: In her public Memorandum, Abruzzo said that *she* would "urge the Board to correct" *Babcock*, which she viewed as an "anomaly."[14]

108.     Abruzzo's public Memorandum is a classic example of illegal jawboning.

109.     "Jawboning is the use of official speech to inappropriately compel private action. Jawboning occurs when a government official threatens to use his or her power—be it the power to prosecute, regulate, or legislate—to compel someone to take actions that the state official cannot."[15]

110.     The Supreme Court has repeatedly held that freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maryland,* 430 U.S. 705, 714 (1977) (cleaned up).

111.     "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

---

[14] The word "urge" is defined as "[t]o advocate earnestly the doing, consideration, or approval of; press for[.]" *Urge*, *The American Heritage Dictionary of the English Language* (5th ed. 2022).
[15] *See* Will Duffield, *Jawboning against Speech*: *How Government Bullying Shapes the Rules of Social Media*, Policy Analysis no. 934, at p. 2, Cato Institute, Washington D.C. (Sep. 12, 2022), *available* at www.cato.org/policy-analysis/jawboning-against-speech.

112.     In *Janus v. AFSCME, Council 31*, the Supreme Court applied this fundamental right not to speak to prohibit public unions from collecting agency fees from employees unless an employee affirmatively consents to pay such fees to the unions. 138 S. Ct. 2448, 2486 (2018).

113.     And the Supreme Court has *never* held that employers are prohibited from speaking to their employees as a "captive audience."  It has applied a "captive audience" analysis in other contexts "only sparingly to protect unwilling listeners from protected speech." *Snyder v. Phelps*, 562 U.S. 443, 459 (2011) (emphasis provided); *see Rowan* v. *Post Office Dept.*, 397 U.S. 728, 736-38 (1970) (upholding a statute allowing a homeowner to restrict delivery of offensive mail to their home); *see Frisby v. Schultz*, 487 U.S. 474, 477, 484-85 (1988) (upholding an ordinance prohibiting picketing near an individual's residence).

114.     Here, Abruzzo's Memorandum violates the compelled speech doctrine under the First Amendment, because it impermissibly compels employers to express certain speech to their employees. Her Memorandum compels employers during "convened" and "cornered" work meetings on employee union representation to "adopt sensible assurances" in their speech, so the employees know "their attendance is truly voluntary."

115.     Abruzzo's Memorandum is consistent with recent reports characterizing Abruzzo's actions as favoring unions. Because in an Abruzzo world, she "can prescribe what shall be orthodox" for employers to say to their employees while the employees are at work. *See Barnette*, 319 U.S. at 642.

116.     Conveniently for Abruzzo (and unions), the very words she compels employers to speak would then let employees know they don't have to actually listen to their employer's opinion on unionization during mandatory meetings.

117.     This compulsion by Abruzzo to coerce employers to adopt  certain words and language when they speak to their employees violates the First Amendment.

COUNT II – Free Speech
Abruzzo's Memorandum GC 22-04 is a purely *ultra vires* act that violates
the First Amendment because it regulates employer speech
under threat of prosecution based on content.

118.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

119.     "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972).

120.     "Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion).

121.     When regulating speech, the government must be neutral as to both viewpoint and subject matter. *See Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983). Viewpoint neutrality forbids the government from regulating speech based on the ideology of the message. Subject-matter neutrality forbids the government from regulating speech based on its topic.

122.     Abruzzo's Memorandum violates the First Amendment because it is a content-based regulation that impermissibly regulates speech based on both the viewpoint expressed and the topic of expression.

123.     First, her Memorandum is a content-based regulation because it regulates *employer* speech on employee union representation and not *union* or *employee* speech and by its very terms, draws a distinction among speech based on the viewpoint expressed. *See generally Boos v. Berry*, 485 U.S. 312 (1988) (emphasis provided).

124.     Second, her Memorandum is a content-based regulation because it allows employer speech about the subject of employee union representation when employees are told their attendance is truly voluntary, but not otherwise. *See generally Carey v. Brown*, 447 U.S. 445 (1980).

125.     Once again, Abruzzo's Memorandum favors unions and disfavors employers because she only places content-based speech restrictions on employers, and not on employees and unions.

126.     Abruzzo's content-based speech restrictions applied to employers in her Memorandum are "presumptively invalid" under the First Amendment. *See City of St. Paul*, 505 U.S. at 382.

COUNT III – Free Speech and Due Process
Abruzzo's Memorandum GC 22-04 is a purely *ultra vires* act that violates both the
First and Fifth Amendments because it regulates employer speech
under threat of prosecution and is unduly vague

127.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

24

128.     "[S]tandards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

129.     Because "First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.* at 432-33; *see also, e.g., Baggett v. Bullitt*, 377 U.S. 360, 366 (1964) (invalidating statutory provisions "because their language [was] unduly vague, uncertain, and broad," particularly the term "subversive," which gave individuals very little guidance as to what speech and activities were prohibited). *Id.*

130.     Nearly a century ago, the Supreme Court held a law is unconstitutionally vague "when people of common intelligence must necessarily guess at its meaning." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

131.     The void-for-vagueness doctrine is applicable in challenges to laws, ordinances, rules, policies, and statutes under both the First and Fifth Amendments to the Constitution. For example, in *City of Chicago v. Morales*, the Supreme Court invalidated a law on due process vagueness grounds. 527 U.S. 41 (1999).

132.     Due process challenges are about basic fairness and notice: reasonable people should not have to "guess" at the meaning of a statute or rule as to what behavior is permitted and what is prohibited. *See Connally*, 269 U.S. at 391.

133.     Abruzzo's Memorandum is unconstitutionally vague under the First and Fifth Amendments because a reasonable employer cannot know what speech is prohibited or permitted.

134.    Her Memorandum requires employers to "adopt sensible assurances" in their speeches to employees on unionization during "convened" and "cornered" work meetings.

135.    But a reasonable employer has minimal guidance as to what would constitute a "sensible" assurance during "convened" and "cornered" work meetings and thus cannot know what speech is prohibited or permitted.

136.    Abruzzo's Memorandum therefore fails under both the First and Fifth Amendments because it is unduly vague.

COUNT IV – Free Speech

Abruzzo's Memorandum GC 22-04 is a purely *ultra vires* act that violates the First Amendment because it is a prior restraint on employer speech under threat of prosecution.

137.    Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

138.    The Supreme Court has declared that "prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

139.    And the Supreme Court has made clear that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *New York Times v. United States*, 403 U.S. 713, 714 (1971).

140.    Prior restraints are unconstitutional outside exceptional and limited circumstances, such as military necessities during wartime. *Near v. Minnesota,* 283 U.S. 697, 716 (1931).

141.    Preventing prior restraints of speech is an essential component of the First Amendment's free speech guarantee. *Freedman v. Maryland*, 380 U.S. 51, 58 (1965).

142.    The policy against prior restraints is "deeply etched in our law" because "a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (emphasis in original).

143.    *Bantam Books* is particularly instructive here. In that case, a state commission sent notices to book distributors advising them that it had deemed certain books "objectionable" for sale to minors. The notices included a typical reminder to the recipient of the commission's "duty to recommend to the Attorney General prosecution of purveyors of obscenity" and informed the distributor that the commission had sent lists of "objectionable" books to local police. 373 U.S. at 61-63.

144.    The effect of the written notices was to impose an informal censorship scheme, which constituted an unconstitutional prior restraint through "intimidation and threat of prosecution." 372 U.S. at 64.

145.    Abruzzo's Memorandum imposes a similar unconstitutional prior restraint because it impermissibly regulates the content of employer speech in certain forums before such speech occurs. It prohibits employers from communicating their views, arguments, or opinions on unionization to their employees during "convened" or "cornered" work meetings, unless an employer "adopts sensible assurances" in their speech, so the employees know "their attendance is truly voluntary."

146.    Like the notices in *Bantam Books*, Abruzzo's threat of prosecution in her Memorandum is an informal censorship scheme and unconstitutional prior restraint targeting employers by reason of "intimidation and threat of prosecution." *See id*.

147.    Her Memorandum commits a cardinal sin in regulating speech that is contrary to longstanding policy and First Amendment jurisprudence: Abruzzo desires to "throttle" employers "beforehand" when regulating their speech, which is a prior restraint that violates the First Amendment. *See Conrad*, 420 U.S. at 559.

REQUEST FOR RELIEF

WHEREFORE, Plaintiff ABC Michigan respectfully requests that this Court:

A. Issue a preliminary injunction, later to be made a permanent injunction, against General Counsel Jennifer Abruzzo (1) stopping her from threatening to prosecute employers in her Memorandum on the Board's public website; and (2) ordering her to retract, delete, and remove her Memorandum from the Board's public website.

B. Declare under Claims I-IV that Abruzzo threatened to prosecute employers in her Memorandum on the Board's public website in violation of the First and Fifth Amendments to the United States Constitution;

C. Award Plaintiff its costs and reasonable attorneys' fees incurred if applicable and provided by law; and

D. Grant Plaintiff such further relief this Court deems just, proper, and equitable.

March 16, 2023                    Respectfully submitted,

                                  */s/ Keith E. Eastland*
                                  Keith E. Eastland
                                  Stephen J. van Stempvoort
                                  Brett Swearingen
                                  MILLER JOHNSON
                                  45 Ottawa Ave. SW
                                  Grand Rapids, MI 49503
                                  Telephone: (616) 831-1700
                                  eastlandk@millerjohnson.com
                                  vanstempvoorts@millerjohnson.com
                                  swearingenb@millerjohnson.com

                                  M. E. Buck Dougherty III, *pro hac vice forthcoming*
                                  Jeffrey Jennings, *pro hac vice forthcoming*
                                  Noelle Daniel, *pro hac vice forthcoming*
                                  LIBERTY JUSTICE CENTER
                                  440 N. Wells Street, Suite 200
                                  Chicago, Illinois 60654
                                  312-637-2280-telephone
                                  312-263-7702-facsimile
                                  bdougherty@libertyjusticecenter.org
                                  jjennings@libertyjusticecenter.org
                                  ndaniel@libertyjusticecenter.or

                                  Attorneys for Plaintiff Associated Builders and
                                  Contractors of Michigan